RECEIVED
CLERK'S OFFICE

2013 JUL -8 AM 11: 37

U.S. DISTRICT COURT
MIDDLE DIST. OF GEORGIA
MACON, GEORGIA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

UNITED STATES OF AMERICA )
    ex rel. CONNIE BROGDON and )
    SUMMER HOLLAND;  and )
STATE OF GEORGIA )
    ex rel. CONNIE BROGDON and )
    SUMMER HOLLAND, )
  )
    Plaintiff-Relators, )
  )
v. )
  )
HOSPITAL  AUTHORITY OF IRWIN )
COUNTY; MAHENDRA AMIN, M.D.; )
ASHFAQ SAIYED, M.D.; ROMANA )
BAIRAN, M.D.; ARTURO RUANTO, )
M.D.; CONCORDIO URSAL, M.D.; )
DREW HOWARD, M.D.; STEVE )
ANDERSON, M.D.; ROBERT  REESE )
M.D.; and MARSHALL TANNER, M.D., )
  )
    Defendants. )

Civil Action No. _ 7: **13-CV-** 97
                            HL
Jury Trial Demanded

## COMPLAINT

The United States of America and State of Georgia, by and through

Relators Connie Brogdon and Summer Holland, bring this action under 31 U.S.C.

§§ 3729-3732 ("False Claims Act"), 42 U.S.C. § 1320a-7b(b)(1)-(1) ("Anti-Kickback

Statute"), and O.C.G.A. §§ 49-4-168.1 *et seq.* ("State False Medicaid Claims Act")

to recover all damages, penalties, and other remedies established by the False

Claims Act on behalf of the United States and Relators, and the State False

Medicaid Claims Act on behalf of the State of Georgia and Relators, and would show the following:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729, *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a).

3.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

4.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## THE PARTIES

5.     Irwin County Hospital ("ICH") is located at 710 N Irwin Ave., Ocilla, Georgia 31774.

6.     Irwin County Hospital is owned and operated by the Irwin County Hospital Authority.

7.     Dr. Mahendra Amin is a doctor of Obstetrics & Gynecology with privileges at and affiliation with Irwin County Hospital.

2

8.     Upon information and belief, Dr. Amin is a part owner of Irwin County Hospital.

9.     Dr. Amin also owns and operates MGA Health Management, Inc. ("MGA"). MGA's primary business address is 2016 Ocilla Rd., Douglas, Georgia 31533.

10.    Upon information and belief, Dr. Amin and MGA own and operate practices at 1022 Bryan St. W, Douglas, Georgia 31533, and 357 Cargile Rd., Ocilla, Georgia 31774.

11.    Defendants Ashfaq Saiyed, M.D.; Romana Bairan, M.D.; Arturo Ruanto, M.D.; Concordio Ursal, M.D.; Drew Howard, M.D.; Steve Anderson, M.D.; Robert Reese, M.D.; and Marshall Tanner, M.D. are physicians with privileges at and affiliation with Irwin County Hospital. These defendants, along with Dr. Amin, shall collectively be referred to as "the Doctors."

12.    Dr. Saiyed also owns and operates ASF Medical Center Inc. ("ASF"). ASF's primary business address is 159 Frank Church Rd., Ocilla, Georgia, 31774.

13.    ASF operates a medical center at 2016 Ocilla Rd., Douglas, Georgia 31533.

14.    Relator Connie Brogdon was an X-Ray technician at Irwin County Hospital from June 17, 2006 through April 10, 2013.

15.    Relator Summer Holland was an X-Ray technician at Irwin County Hospital from November 2008 through the present.

16.    Relators Brogdon and Holland are original sources of all the allegations raised herein.

17.    As required by the False Claims Act and State False Medicaid Claims Act, Relators voluntarily submitted a confidential written disclosure statement (subject to the attorney client privilege, the common interest privilege, and the joint prosecutorial privilege) to the United States Government via the United States Attorney's Office in the Northern District of Georgia, and to the Georgia Attorney General's office, containing material evidence and information in their possession pertaining to the allegations contained in this Complaint.

## FEDERALLY FUNDED HEALTH PROGRAMS

18.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

19.    The Medicare program is comprised of two parts. Medicare Part A provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. § 1395c 1395i 2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers the fee schedule amount for laboratory services. 42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

4

20.    Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b).

21.    In order to receive Medicare funds, enrolled suppliers, including the Clinic, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

22.    Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (a) bill Medicare Carriers for only those covered services which are medically necessary; (b) not bill Medicare Carriers for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

23.   Title XVIII of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

24.   At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

25.   Medicare Part B—the portion of the program that covers the costs of physician services, supplies, and tests—only covers tests that are "reasonable and

necessary." 42 U.S.C. § 1395x(s)(3) (2003); *id.* § 1395y(a)(1)(A) (2003). For a diagnostic test to be "reasonable and necessary," it "must be furnished under the appropriate level of supervision by a physician." 42 C.F.R. § 410.32(b)(1) (2003).

26.    42 C.F.R. §§ 455, *et seq.*, expressly states that a provider must certify that he is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid.

27.    At all times relevant to this Complaint, the Medicare and Medicaid programs constituted a significant source of gross patient revenue for each of the Defendants.

28.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that if those who influence healthcare decisions were allowed to have a financial stake in selection of healthcare goods and services, their judgment might be tainted, resulting in goods and services being provided that are medically unnecessary, of poor quality, or even harmful.

29.    To protect the integrity of government programs, in 1972 Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care, strengthening that statute in 1977 and again in 1987. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142;

Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No.

100-93.

30.   Among other provisions, the AKS makes criminal certain types of

remunerative arrangements:

> (b) Illegal remunerations.
> (1) Whoever knowingly and willfully solicits or receives any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A) in return for referring an individual to a person
>> for the furnishing or arranging for the furnishing of any
>> item or service for which payment may be made in
>> whole or in part under a Federal health care program,
>> or
>> (B) in return for purchasing, leasing, ordering, or
>> arranging for or recommending purchasing, leasing, or
>> ordering any good, facility, service, or item for which
>> payment may be made in whole or in part under a
>> Federal health care program,
>
>> shall be guilty of a felony and upon conviction thereof,
>> shall be fined not more than $ 25,000 or imprisoned for not
>> more than five years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any
> remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind to
> any person to induce such person—
>
>> (A) to refer an individual to a person for the
>> furnishing or arranging for the furnishing of any item
>> or service for which payment may be made in whole or
>> in part under a Federal health care program, or
>> (B) to purchase, lease, order, or arrange for or
>> recommend purchasing, leasing, or ordering any good,
>> facility, service, or item for which payment may be

made in whole or in part under a Federal health care
program,

  shall be guilty of a felony and upon conviction thereof, shall
be fined not more than $ 25,000 or imprisoned for not more
than five years, or both.

42 U.S.C. § 1320a-7b.

31.  The Stark Laws are made up three separate provisions which govern physician self-referral for Medicare and Medicaid patients. Under the Stark Laws, physicians are prohibited from referring a patient to a medical facility in which they have a financial interest. Given the physician's position to benefit from the referral there is both an inherent conflict of interest, and potential for over-utilization of services. In addition, such referrals could limit competition. Stark regulations may be found at 42 C.F.R. § 411.350 through § 411.389.

32.  Stark I was included as a provision in the Omnibus Budget Reconciliation Act of 1989 and barred self-referrals for clinical laboratory services under the Medicare program, effective January 1, 1992. Stark I also included a series of exceptions to accommodate legitimate business arrangements. Stark II, contained in the Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), expanded the restriction to a range of additional health services and applied it to both Medicare and Medicaid.

33.  The Designated Health Services ("DHS") covered by the Stark Laws include clinical laboratory services; physical therapy; occupational therapy;

radiology and imaging services; radiation therapy and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics and prosthetic devices; home health care and supplies; outpatient prescription drugs; and inpatient and outpatient hospital care.

34.    Stark broadly defines "referral" to include a request by a physician for an item or service payable under Medicare or Medicaid (including the request by a physician for consultation with another physician as well as any test/procedure ordered/performed by such other physician), or a request by a physician for the establishment of a care plan to include provision of a DHS.

35.    In addition to the hospital fees billed by hospitals, physicians bill for their services provided to Medicare and Medicaid patients. Physicians and physician groups submit form CMS-1500 (or their electronic equivalent) for this purpose. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

36.    By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicaid program, and that they

have complied with all applicable regulations and laws governing the program,
including the Anti-Kickback Statute.

37.   On March 23, 2010, President Obama signed into law the health care
reform bill, the Patient Protection and Affordable Care Act (PPACA), codified at
42 U.S.C. § 1320a-7a.

38.   The PPACA makes it a violation of the False Claims Act to present or
cause to be presented to the Government a claim that:

(A)   is for a medical or other item or service that the person knows or should
know was not provided as claimed, including any person who engages in
a pattern or practice of presenting or causing to be presented a claim for an
item or service that is based on a code that the person knows or should
know will result in a greater payment to the person than the code the
person knows or should know is applicable to the item or service actually
provided,

(B)   is for a medical or other item or service and the person knows or should
know the claim is false or fraudulent,

(C)   is presented for a physician's service (or an item or service incident to a
physician's service) by a person who knows or should know that the
individual who furnished (or supervised the furnishing of) the service was
not licensed as a physician, or

11

(D) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary.

39.   The PPACA also makes a person or entity civilly liable who offers to or transfers remuneration to any individual eligible for benefits under title XVIII of this Act [42 U.S.C. §§ 1395 *et seq.*], or under a State health care program (as defined in section 1128(h) [42 U.S.C. § 1320a-7(h)]) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under title XVIII [42 U.S.C. §§ 1395 *et seq.*], or a State health care program (as so defined).

## FACTUAL ALLEGATIONS

### No Physicians Present For Examinations or Treatments

40.   It is standard practice and procedure at ICH to not have any physicians present at ICH to examine or treat patients upon admission.

41.   ICH has one doctor "on call" for the emergency room. This means that unless a doctor is at ICH for another reason, there are no doctors present to treat the patients.

42.   Instead, when patients come in, nurses diagnose the patients, and then follow the Doctors' "standing orders," scripted procedures based on the nurse's

diagnosis, which includes explicit instructions as to if and when a doctor is to be contacted for a consult for that patient.

43.    This results in patients being diagnosed by nurses with no physician input or analysis.

44.    The nurses also administer treatments to the patients without physicians present to supervise them.

45.    There is no evaluation of the patient by a physician to determine if a treatment is medically necessary before it is administered by ICH pursuant to the standing orders.

46.    Many of these standing orders include the performance of a CT scan with contrast. The X-Ray technicians inject the patients with contrast without a physician on site to be immediately available to furnish assistance and direction throughout the performance of the procedure, as is required by CMS regulations.

47.    Each morning, the on-call doctor comes into ICH and reviews the files for the patients to have come into ICH and received treatment over the preceding 24 hours.

48.    Despite being treated by the nurses and not by a physician, the treatments from the preceding day and night are billed to Medicare and Medicaid as if the on-call doctor had actually performed treatment on the patients.

49.   Each claim submitted to Medicare and Medicaid where no doctor was present for the examination, diagnosis, and/or treatment is false.

50.   The Doctors have conspired with ICH to implement this practice of having one of the Doctors act as the on-call doctor while no doctors are present at ICH.

51.   ICH established and issued its policy regarding verbal/phone orders on February 18, 1998, and has utilized it ever since.

52.   Moreover, ICH creates false records that indicate that the physician with the standing order being applied was the admitting and ordering physician.

53.   Relators are aware that this scheme has been perpetrated at ICH since before they were employed by ICH.

54.   On April 6, 2012, Patient KO, MR Number 31157 was treated at the ICH emergency room.

55.   Patient KO was given a head CT without contrast, which was billed to Medicaid on April 6, 2012 for $714. A total of $1,541.45 was billed to Medicaid for this patient visit.

56.   Patient KO never saw a doctor before being diagnosed. All of the physician orders actually came from standing orders.

57.   Dr. Ruanto was the on call physician and was listed on the CT Medical Imaging Report as being the admitting and ordering physician, but Patient KO

14

was never examined by Dr. Ruanto, and Dr. Ruanto was never consulted prior to treatment and discharge of this patient.

58.    All of the treatments and drugs received by Patient KO were from nurses and technicians; she was never treated by a physician during that visit.

59.    On February 3, 2013, patient MM, MR Number 1573, was given a head CT scan, a chest CT scan, and an abdominal CT scan, all based on standing orders without the patient first being examined or evaluated by a physician.

60.    Dr. Royce Cannington and Dr. Anna Franklin signed Medical Imaging Reports that said Dr. Ursal was the admitting and ordering physician, when Dr. Ursal – who was on-call – never examined Patient MM.

61.    These three scans were billed to Medicaid on February 26, 2013.

62.    All of the treatments and drugs received by Patient MM were from nurses and technicians; she was never treated by a physician during that visit.

63.    As a subset of the above-referenced claims, Dr. Amin has a standing order at ICH which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition.

64.    For example, no matter what symptoms the patient might be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting him or obtaining his or any other doctor's medical opinion for that particular patient.

65.    On May 2, 2013, Martha Cowan, Utilization Review, sent a memo to the X-Ray staff stating that Medicaid will only pay for a single sonogram, so if a previous sonogram was billed to Medicaid, the X-Ray technician should contact the physician "to see if one is still needed."

66.    The May 2, 2013 memo further states that "if it [the sonogram] is ordered on the weekend under routine standing orders... and there is not an indication... [of] something actually wrong with the baby" to contact Dr. Amin to find out if a previous sonogram had been performed.

67.    In other words, this memo is stating that a sonogram is to be performed even if there is no indication of something wrong with the baby as long as Medicaid will pay for it, but to find out whether it is medically necessary if Medicaid might not pay for it.

68.    For example, on May 30, 2013, Patient SW, MR Number 50974, was admitted to ICH with a diagnosis of seizure prophylaxis. Patient SW is insured by Medicaid. She was treated pursuant to a standing order entitled Magnesium Sulfate Protocol for OB Patient.

69.    Although the standing order for Magnesium Sulfate Protocol includes an OB sonogram, it was cancelled for Patient SW. Upon information and belief, the sonogram was stricken from the standing order for Patient SW because she had already had a sonogram that had been billed to Medicaid.

70. Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary.

71. Dr. Amin is always listed on the Medical Imaging Reports as being the admitting physician and ordering physician even though he was not present at ICH and does not examine the patient prior to treatment.

72. For example, Patient NN, MR Number 52200, whose primary insurance was Medicaid, was admitted to the ER on February 4, 2013 and diagnosed with bronchitis.

73. Per Dr. Amin's standing order, ICH performed an OB ultrasound of Patient NN, who was 22 weeks pregnant. The medical reason given for this ultrasound was "Fetal Well Being." No abnormalities were found.

74. Dr. Amin was not at ICH to order the ultrasound, and nobody at ICH consulted with Dr. Amin before the ultrasound was performed. Nor were any other physicians consulted with prior to performing the ultrasound.

75. ICH billed Medicaid for Patient NN's ultrasound on February 7, 2013.

76. Medicaid paid ICH for Patient NN's ultrasound on February 26, 2013.

77. On March 22, 2013, Patient VP, MR Number 59061, was admitted to the ICH emergency room for observation. She was a patient of Dr. Amin, and Medicaid was her primary insurance.

78.   Patient VP received an OB ultrasound as a part of Dr. Amin's standing order without being examined by Dr. Amin. Patient VP was not examined by a physician prior to receiving an ultrasound at ICH on March 22, 2013.

79.   Patient VP's ultrasound was billed to Medicaid on March 29, 2013.

80.   On April 4, 2013, Patient NW, MR Number 59575, was admitted to the ICH emergency room. Medicaid was her primary insurance.

81.   Patient NW received an OB ultrasound as a part of Dr. Amin's standing order without first being examined by Dr. Amin. She also received a renal ultrasound for her diagnosis of pregnancy-induced hypertension, also as part of a standing order. These ultrasounds were billed to Medicaid.

82.   Patient NW was not examined by a physician prior to receiving an ultrasound at ICH on April 4, 2013.

83.   Patient JD, MR Number 59454, was admitted to the ICH emergency room on March 21, 2013. Medicaid was her primary insurance.

84.   Dr. Saiyed was the on call doctor for that date. Dr. Amin was not at ICH or on call when Patient JD was admitted.

85.   Even though Patient JD was only 9 weeks and 5 days pregnant, ICH performed an OB ultrasound of the patient pursuant to Dr. Amin's standing order.

18

86.   The Medical Imaging Report for Patient JD, signed by Dr. Charles Brown, falsely states that Dr. Amin was the admitting and ordering physician, even though Dr. Amin was not at ICH or consulted prior to the ultrasound.

87.   This ultrasound for Patient JD was billed to Medicaid on March 29, 2013.

88.   Patient SP, MR number 46788, was admitted to the ICH emergency room on March 27, 2013 with a cough. She was a patient of Dr. Amin, and Medicaid was her primary insurance.

89.   Even though Patient SP was diagnosed with bronchitis, ICH performed an OB ultrasound of the patient. The medical reason given for this ultrasound was "IUP Bronchitis." No abnormalities were found.

90.   The Medical Imaging Report for Patient SP, signed by Dr. Janica Peavey, falsely states that Dr. Amin was the admitting and ordering physician, even though Dr. Amin was not at ICH or consulted prior to the ultrasound.

91.   This ultrasound for Patient SP was billed to Medicaid on April 4, 2013.

92.   On April 5, 2013, Patient BF, MR # 46387, was treated pursuant to Dr. Amin's standing "premature labor orders" without ever being examined by a physician. ICH billed Medicaid $1,694.74 for her treatment.

93.   Dr. Howard has a standing order for obstetrical patients who are diagnosed with bronchitis which includes the following tests, and for which Medicare and/or Medicaid are billed: CBC with auto diff-OB, basic metabolic

panel, urinalysis ob, culture sputum, gram stain sputum, sputum collection (respiratory), respiratory consult, chest X-Ray with abdominal shield, U/S-OB sonogram, electronic fetal monitoring.

94.    Dr. Howard's standing order for obstetrical patients who are diagnosed with bronchitis also includes administration of the following drugs, and for which Medicare and/or Medicaid are billed, depending on the symptoms being complained of: DsRL IV, Ancef, Zithromax, Percocet/Vicodin/Tylenol (depending on the pain level), Restoril, Phenergan with codeine, Zofran, and Mylanta.

95.    All of these procedures and drugs are ordered by nurses based on the standing order of Dr. Howard, without a physician examining the patient.

96.    On February 25, 2013, Patient AW, MR Number 51715, was diagnosed with bronchitis. She was also pregnant. Under the standing order of Dr. Howard, she received an ultrasound and chest and sinus X-rays at ICH without ever being seen by a physician, but Dr. Howard was listed as the admitting and ordering physician.

97.    For Patient AW's visit, ICH billed WellCare (which provides Medicare and Medicaid plans) on March 4, 2013 and again on March 6, 2013, for a total of $5,061.09, which Medicaid paid to ICH on March 19, 2013.

98.    If a pregnant patient complained of vomiting, she was treated under the standing order for hyperemesis, with no additional evaluation required by ICH.

99.    For example, Patient TJ, MR Number 57469, complained of nausea and vomiting and so she was diagnosed by ICH nurses with hyperemesis. ICH gave her a pelvic ultrasound, gallbladder ultrasound, and OB ultrasound, all of which were billed to Medicaid on December 28, 2012 (except for the OB ultrasound, which was billed as a separate claim on January 3, 2013, for $300).

100.   On April 14, 2012, Patient AB, MR Number 56676, was treated at ICH for abdominal pain. She was diagnosed by the nurses with hyperemesis, who treated her according to Dr. Howard's standing order, which included a gallbladder ultrasound and OB ultrasound.

101.   ICH submitted a claim to Medicaid for $6,018.41 on or about June 27 or June 28, 2012 for Patient AB's visit. Medicaid paid ICH $4,834.46 on July 11, 2012 for Patient AB's visit.

102.   Patient KC, MR Number 57977, was treated at ICH for abdominal pain. She was diagnosed by the nurses with hyperemesis, who treated her according to the hyperemesis standing order, which included a gallbladder ultrasound and OB ultrasound, even though the fetus was only 7 weeks old.

103.   Dr. Amin was listed as the admitting and ordering physician on the Medical Imaging Reports, even though he did not examine Patient KC prior to her receiving the ultrasounds.

104.   ICH submitted a claim to Medicaid for $4,190.37 on December 31, 2012 for Patient KC's visit, and Medicaid paid ICH $4,130.37 on January 8, 2013 for Patient KC's visit.

105.   On May 18, 2012, Patient YK, MR Number 50858, was treated at ICH for abdominal pain. The nurses followed the "abdominal pain protocol" and diagnosed her with pelvic inflammatory disease.

106.   ICH performed a CT Abdomen/Pelvis with Contrast, CPT Code 74177, without a physician present to order it or supervise. Dr. Amin is listed as the admitting and ordering physician, but he was not present at ICH nor did he examine Patient YK.

107.   ICH submitted a claim to Medicaid for $16,880.96 on May 29, 2012 for Patient YK's visit. On June 20, 2012, Medicaid paid ICH $5,164.57 for this claim.

108.   X-Ray technician Amanda Driggers writes orders for patients to receive mammograms without first consulting with a physician.

109.   Upon information and belief, she has been given carte blanche by Dr. Amin to order mammograms for any patients who claim that Dr. Amin told them to get a mammogram.

110.   This results in patients getting mammograms, which are then billed to Medicare or Medicaid, that were never ordered by a physician.

111.   For example, on April 11, 2013, Patient KB, MR Number 45042. The order listed Dr. Amin as the ordering physician, but Driggers did not consult with Dr. Amin prior to writing the order or performing the mammogram.

112.   On April 22, 2013, ICH billed Medicare for $673.32 for Patient KB's mammogram.

113.   On May 6, 2013, Medicare paid ICH $635.35 for Patient KB's mammogram.

114.   On May 15, 2013, Relator Holland witnessed Driggers write an order for a mammogram for Patient JH, MR Number 21877. The order listed Dr. Amin as the ordering physician, but Driggers did not consult with Dr. Amin prior to writing the order or performing the mammogram.

115.   ICH charged $518 for this mammogram for Patient JH, who is insured by Medicare.

## Stark Law Violations and Kickbacks

116.   The Doctors schedule procedures for their patients at ICH or refer their patients to Irwin County Hospital, including patients who are closer to other hospitals.

117.   Because Dr. Amin is a part owner of ICH, he profits financially from every one of his patients who goes to Irwin County Hospital instead of some other hospital.

118.   Relator Brogdon spoke to at least one patient who told her that Dr. Amin gave her gas money to drive to Irwin County Hospital instead of Coffee County Hospital.

119.   Relator Holland similarly heard from Amy Arnold, Director of Medical Imaging at Irwin County Hospital, that Dr. Amin offers his patients gas money to drive to Irwin County Hospital.

120.   Dr. Anderson also sends his patients to Irwin County Hospital, including patients who are closer to Coffee County Hospital.

121.   Upon information and belief, the Doctors are receiving kickbacks from ICH for sending patients there.

### Unbundling CT Scans

122.   CMS packages payments for all diagnostic radiopharmaceuticals and contrast agents in with the major procedure payments, as they function effectively as supplies that enable the provision of an independent service.

123.   Since approximately 2011, ICH has "unbundled" the billing for CT scans.

124.   ICH bills Medicare and Medicaid for the supplies used in the CT scans, even though these supplies are considered a part of the payment under the CPT code and should not be billed separately.

125.   On January 14, 2011, ICH sent a memo to the X-Ray technicians instructing them to charge contrast, needles, and other supplies separate from the CPT codes.

126.   For example, a CT scan of the abdomen with contrast is billed under CPT code 74160. ICH charges $1,050 for this procedure, which charge should include all the necessary supplies, including the contrast agent.

127.   Instead, ICH charges Medicare and/or Medicaid $1,050 for the procedure, and then an additional $250 for the contrast, $6.69 for the IV start kit, and $9.25 for the IV catheter.

128.   Claims that include materials that are already paid for under the CPT code are false.

129.   Since about spring 2012, ICH also unbundles CT scans of the abdomen and pelvis, which should be billed under a single CPT code, into separate CPT codes for a scan of the abdomen and for a scan of the pelvis, including billing twice for the single IV, catheter, and dose of contrast.

130.   ICH even changed its oral contrast agent for some CT scans from barium sulfate (Readi-Cat) to Gastrografin because it could not unbundle the barium

sulfate charge (which is not billable to Medicare or Medicaid), but it could bill Medicare and Medicaid for the Gastrografin.

131.   For example, CPT codes 74176, 74177, and 74178 are used for CT scans of the abdomen and pelvis (which code is proper depends on the level of contrast used).

132.   When ICH performs a CT scan of the abdomen and pelvis, it "unbundles" the billing by separately billing for a CT scan of the abdomen (CPT code 74150, 74160, or 74170) and a CT scan of the pelvis (CPT code 72192, 72193, or 72194).

133.   By unbundling the billing in this way, ICH charges Medicare and Medicaid more for the procedures.

134.   For example, ICH's chargemaster listed $2,365.94 for CPT code 74177, for CT Scan of Abdomen and Pelvis with Contrast. But it charges $1,315.94 for CPT code 74160 – CT Scan of Abdomen with Contrast – and $1,290.94 for CPT code 72193 – CT Scan of Pelvis with Contrast, for a total of $2,606.88.

135.   For example, Patient JS, MR Number 07882, was insured by both Medicare and Medicaid. On May 21, 2010, Patient JS received a CT Scan of Abdomen and Pelvis with and without Contrast.

136.   For Patient JS, ICH charged Medicare for a CT Abdomen with and without contrast ($1,270.00), for a CT Pelvis with and without contrast ($1,069.00), and for the supplies used, including $250 for the contrast.

137.   ICH submitted a claim to Medicare for these and other charges on June 25, 2010, who paid the entire amount of the claim on July 20, 2010.

138.   Patient AK, MR Number 50854, was insured by Medicaid. On May 3, 2010, Patient AK received a CT Scan of Abdomen and Pelvis with and without Contrast.

139.   For Patient AK, ICH charged Medicaid for a CT Abdomen with contrast ($1,050.00), for a CT Pelvis with contrast ($1,025.00), and for the supplies used, including $250 for the contrast.

140.   ICH submitted a claim to Medicaid for these and other charges on May 14, who paid the entire amount of the claim on May 19, 2010.

### Unnecessary Procedures Performed on Nursing Home Patients

141.   ICH is attached by a hallway to the Palemon Gaskins Memorial Nursing Home ("the Nursing Home").

142.   When patients at the Nursing Home are terminal, so that there is nothing more ICH can do to help them, ICH performs unnecessary tests on the patients.

143.   The patients are transported back and forth from the Nursing Home to ICH, which repeatedly performs the same tests on these patients and bills them to Medicare.

144.   For example, a Nursing Home patient diagnosed with pneumonia receives a chest X-Ray every 12 hours.

145. These tests are not medically necessary, as the patient has already been diagnosed, and in some cases are terminal. At best, the tests simply track the patients' progress.

146. Similarly, after ICH determines a Nursing Home patient is terminal, it will continue to perform these tests as often as it can be paid for.

147. These tests are not medically necessary as the patient has been diagnosed and is terminal; at best they simply track the patient's decline.

### Unnecessary Operating Room Charges For CT-Guided Biopsies

148. Patients at ICH are scheduled for CT-guided biopsies with the radiology department.

149. Although all of the prep work could be done in the radiology department, ICH has implemented a rule that all CT-guided biopsy patients be sent to the OR to be prepped for their biopsy.

150. In the OR, the patients are told the benefits and risks of the procedure, and then they are sent back to the radiology department for the procedure to actually be performed.

151. There is no medical purpose for admitting these patients to the OR.

152. On or about November 15, 2012, Amy Arnold, Director of Medical Imaging at Irwin County Hospital and Relators' boss, told both Relators that the

only purpose for admitting patients receiving CT-guided biopsies to the OR was so that ICH could bill an additional OR charge.

153. For example, Patient PB, MR Number 50028, went to ICH to have a biopsy performed on November 15, 2012.

154. Although Patient PB was already scheduled for a biopsy with the radiology department, she was sent to the OR to have the risks and benefits of the procedure explained to her.

155. There was no reason to have Patient PB admitted to the OR just to be talked to, except that doing so enabled ICH and Dr. Stephen Thombley to bill for an additional fee.

156. On January 4, 2013, ICH billed Medicare $300 for a surgical fee for Patient PB.

157. Upon information and belief, this surgical fee was charged for admitting the patient unnecessarily into the OR.

158. On January 22, 2013, Medicare paid ICH for the services provided to Patient PB.

159. On May 28, 2013, Patient JR, MR Number 59796, was similarly admitted to the OR prior to receiving a CT-guided biopsy.

160. Amy Arnold told Relator Holland that the patient was being admitted to the OR to be told about the anesthesia being used in the procedure and to have

an IV started. These processes could have been, and are routinely, performed in the radiology department.

161.   ICH billed Medicare $300 for a surgical fee for Patient JR.

162.   Upon information and belief, this surgical fee was charged for admitting the patient unnecessarily into the OR.

### Retaliation Against Relator Brogdon

163.   On or about February 8, 2013, Relator Brogdon reported to the Joint Commission, which accredits and certifies ICH, that ICH was examining and treating patients without any doctors present, including injecting contrast into patients and performing CT scans of them with no doctors present.

164.   On or about March 1, 2013, the Joint Commission came to ICH and performed a surprise inspection, which found that ICH had violated National Patient Safety Standards.

165.   Management at ICH blamed Relator Brogdon for reporting it to the Joint Commission and getting it written up.

166.   Other employees at ICH told Relator Brogdon that management believed she had called the Joint Commission.

167.   One of the physicians at ICH, Dr. Casey Conner, told Relator Brogdon that he had been told by others at ICH that Relator Brogdon had been the one to call the Joint Commission on the Hospital.

168.   After that, Relator Brogdon was ostracized, her schedule was changed so that she was no longer working with technicians with whom she was friendly, and she was given more work to perform.

169.   On April 10, 2013, ICH terminated Relator Brogdon's employment, by and through her boss Amy Arnold.

170.   ICH refused to pay Relator Brogdon for paid time off she had accrued prior to her termination.

## COUNT I

### Violations of 31 U.S.C. § 3729 – False Claims Act

171.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

172.   As set forth above, each and every Defendant, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

173.   As set forth above, each and every Defendant, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

174.   As set forth above, each and every Defendant, by and through their agents, officers, and employees, knowingly conspired to defraud the Government by getting a false or fraudulent claim allowed or paid, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

175.   Due to the Defendants' conduct, the Government has suffered substantial monetary damages.

176.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, an amount that will be proven at trial.

177.   The United States is entitled to a civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims.

178.   Relators are also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

### Violations of O.C.G.A. § 49-4-168.1 - State False Medicaid Claims Act

179.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

180.   As set forth above, each and every Defendant, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the

Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

181.   As set forth above, each and every Defendant, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(2).

182.   As set forth above, each and every Defendant, by and through their agents, officers and employees, conspired to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid by the Georgia Medicaid program, in violation of O.C.G.A. § 49-4-168.1(a)(3).

183.   Due to the Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

184.   The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, an amount that will be proven at trial.

185.   The State of Georgia is entitled to a civil penalty of between $5,500 and $11,000 as required by O.C.G.A. § 49-4-168.1 for each of the fraudulent claims.

186.   Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to O.C.G.A. § 49-4-168.1(i)(2).

## COUNT III

### Violations of 31 U.S.C. § 3730 – Retaliation

187.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

188.   ICH and its ownership and management violated Relator Brogdon's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against Relator Brogdon for lawful acts done by her in furtherance of other efforts to stop one or more violations alleged in this action.

189.   As a result of ICH's actions, Relator Brogdon has suffered damages in an amount to be shown at trial.

## COUNT IV

### Violations of O.C.G.A. § 49-4-168.4 – Retaliation

190.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

191.   ICH and its ownership and management violated Relator Brogdon's rights pursuant to O.C.G.A. § 49-4-168.4 by retaliating against Relator Brogdon for

lawful acts done by her in furtherance of an action under this section, including investigating matters that could reasonably lead to the filing of such an action.

192.   As a result of ICH's actions, Relator Brogdon has suffered damages in an amount to be shown at trial.

## COUNT V

### Breach of Contract

193.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

194.   As part of their employment with ICH, Relators had 401(k) retirement plans.

195.   ICH agreed to match 4% of Relators' gross pay in the retirement plans.

196.   ICH did not make a number of contributions into Relators' retirement plans.

197.   For example, although Relator Brogdon opened her retirement plan on May 11, 2009, and contributions were withheld from her paychecks immediately thereafter, upon information and belief ICH did not make any contributions to Relator Brogdon's retirement plan until February 22, 2010.

198.   ICH has also refused to pay Relator Brogdon for paid time off she accumulated during her tenure at ICH.

199.   As a result of ICH's actions, Relator Brogdon has suffered damages in an amount to be shown at trial.

## COUNT VI

### Litigation Expenses Pursuant to O.C.G.A. § 13-6-11

200.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

201.   Defendants have acted in bad faith, have been stubbornly litigious, and have caused Relators unnecessary trouble and expense.

202.   Accordingly, the Court should award Relators the expenses of litigation, including attorneys' fees and costs, pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Connie Brogdon and Summer Holland pray for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a civil penalty of $11,000 for each of the false claims;

(c) awarding the State of Georgia treble damages sustained by it for each of the false claims;

(d) awarding the State of Georgia a civil penalty of $11,000 for each of the false claims;

(e) awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator Brogdon special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h);

(g) awarding Relator Brogdon special damages resulting from the retaliation pursuant to O.C.G.A. § 49-4-168.4;

(h) awarding Relators their litigation costs and reasonable attorney's fees; and

(i) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

_____

Mike Bothwell
Georgia Bar No. 069920
Mike@bbv-law.com
Julie Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698

BOTHWELL
BRACKER
ATTORNEYS AT LAW
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606

Brandon Hornsby
Georgia Bar No. 367680
Hornsby Law Group
1180 W Peachtree St NW #2220
Atlanta, GA 30309
Ph: (404) 577-1505